**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL ACTION H-08-699-1 |
| | § | |
| SANDEEP VERMA *in custody* | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is defendant's motion to suppress evidence. Dkt. 41. Upon consideration of the motion, the response, the supplemental briefing, the evidentiary record, and the applicable law, the motion is DENIED.

### BACKGROUND

In August of 2007, the FBI tracked an Internet Relay Chat server containing images of child pornography to an IP address corresponding to defendant Sandeep Verma's home address in Sugarland, Texas. FBI Agent Stone then began an active investigation of Verma on suspicion that he had violated child pornography laws. During his investigation, Stone learned that Verma would soon be traveling out of the country. Knowing that collectors of child pornography tend to carry images with them when they travel, Stone contacted ICE and requested assistance with their investigation of Verma.

On February 23, 2008, Verma re-entered the United States from Bogota, Colombia. Because Verma was under investigation for child pornography and was entering from a "high-risk" country,[1]

---

[1] Countries are considered "high-risk" by ICE for different types of crime. Agent Johnson testified that "Colombia is known to be a country that individuals frequently visit for sex tourism or, basically, to have sex with children or to procure child pornography because it's readily available on the streets of countries in Latin America." Dkt. 57, at 78.

Verma was selected for secondary screening.[2] ICE Agent Johnson and computer forensic ICE Agent Harrison came to the airport to assist in the screening. The ICE agents and Stone examined Verma's laptop and some of the CD's he was carrying. One of the CD's contained images of child pornography.

Additionally, Agent Stone and ICE Agent Johnson interviewed Verma. Prior to interviewing Verma, Agent Johnson advised him of his rights under *Miranda*, and Verma signed a waiver of those rights. During the course of the interview, Verma declined to answer certain questions. According to the testimony of the agents, Verma would say "I choose not to answer that question," or "I plead the Fifth as related to that question." The agents interpreted his statements as a desire to avoid certain topics and would, therefore, change topics when Verma chose not to answer a question. At no time did Verma state that he wished to terminate the interview. The agents testified that Verma did not invoke his right to counsel during the interview, although Johnson testified that Verma requested an attorney at the end of the interview. The agents testified that if Verma had asked for a lawyer during the interview, they would have immediately terminated the interview. At the end of the interview Verma was taken into custody by state officials and charged with possession of child pornography.

On February 24, 2008, pursuant to a search warrant issued by a Magistrate Judge in the Southern District of Texas, agents searched the Sugar Land address supplied to them by Verma

---

[2] Agent Johnson testified that the initial contact with incoming travelers, including initial interviews is conducted by Customs and Border Protection ("CBP"). Any traveler entering the United States is subject to secondary screening. However, certain factors—such as an active criminal investigation, or entry from a high-risk country—heighten the odds of secondary screening. If a traveler is selected for secondary screening, then the investigation is continued by ICE, either the general ICE agents at the airport or subject specific ICE agent teams. Johnson belonged to the Cyber Crimes Operation Predator Squad tasked with investigating child exploitation and child pornography, among other cyber crimes.

during the interview. However, Verma had previously separated from his wife and was no longer living with his family at the Sugar Land address. The search yielded no images of child pornography at the home.

That same day, Verma's current girlfriend, Roxanne Witte, called the FBI and reported that she had a computer in her possession for which she believed the FBI had been searching. She had received a telephone call from Verma that morning, asking her to remove his computer from his current residence. He told her that his Sugar Land house had been searched and he needed her to remove the computers and hide them. She did as he asked and removed his computer—among other things—from his house, put it in his car, and parked the car in a lot several blocks from her house.

When Verma left town, he parked his car in front of Witte's house and left the keys with her. Agent Stone testified—and corroborated by reference to his interview notes (302) from the time—that Witte told them that when Verma went out of town, she used the car regularly because it was a large four door sedan and more useful for taking clients to see houses in her job as a real estate agent. Agent Johnson also testified that Witte told her she had regular use of the car when Verma was out of town, although Johnson had no notes regarding the amount of time Witte used the car. However, contrary to the testimony of the agents, Witte testified that she had driven the car only one time prior to driving to Verma's house for the computer. She further testified that she had no recollection regarding whether the agents asked her how many times she had used Verma's car.

At the close of the interview, Witte signed a consent to search the car, gave the agents the keys and directions to the location of the car, and told them to take the computer. The agents testified that they believed Witte had authority to consent to a search of the car because she had the keys to the car and told them she drove it regularly. They searched the car and seized several

computers, hard drives, floppy disks, and CD's. Agent Stone secured a search warrant to search the seized computers and media. The search revealed what Agent Stone described as the largest collection of child pornography of which he had ever heard or seen personally—over 100,000 images.

Verma was subsequently charged by indictment on three counts relating to the distribution, transportation, and possession of child pornography.

## ANALYSIS

In the instant motion, Verma moves the court to suppress all of the evidence found in two separate searches, and his statements made to government agents while he was detained at the border at Houston Intercontinental Airport on February 23, 2008. His arguments essentially concentrate on four events/issues:

1. Whether the forensic search of Verma's computer and external drives during the border stop at IAH on February 23, 2008 was constitutional;

2. Whether Verma invoked his right to remain silent, and to what extent, during the questioning during that same border stop;

3. Whether Verma's girlfriend, Roxanne Witte, had the authority to consent to the search of Verma's car; and

4. Whether the materials taken from the computers and hard drives seized from Verma's car must be suppressed because they are fruit of the poisonous tree.

The court examines each in turn.

**A.    The Border Search**

"[W]arrantless searches and seizures are unreasonable per se unless they fall within a few narrowly defined exceptions." *United States v. Cardenas*, 9 F.3d 1139, 1147 (5th Cir.1993). One of the well-established exceptions is the border search exception. *Id.* The government's interest is

4

at its zenith when it is protecting its borders. *United States v. Flores-Montano*, 541 U.S. 149, 152–53, 124 S. Ct. 1582 (2004). Therefore, government agents may conduct "routine searches" without a warrant or probable cause. *United State v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998). "A 'routine' search is one that does not 'seriously invade a traveler's privacy.'" *United States v. Kelly*, 302 F.3d 291, 294 (5th Cir. 2002). "In evaluating whether a search is 'routine, 'the key variable is the invasion of the privacy and dignity of the individual.'" *Id.* (quoting *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir. 1981) (en banc)). The Fifth Circuit has "previously determined that ordinary pat-downs or frisks, removal of outer garments or shoes, and emptying of pockets, wallets, or purses are all routine searches." *Id.*

A non-routine search is more intrusive. The Fifth Circuit, although it did not adopt either test, has cited with approval the factors used by the First and Eleventh Circuits to determine whether a search is "routine." *Id.* at 295. The Eleventh Circuit has identified three factors, including: (1) "physical contact between the searcher and the person searched"; (2) "exposure of intimate body parts"; and (3) "use of force." *Id.* (quoting *United States v. Vega-Barvo*, 729 F.2d 1341, 1346 (11th Cir. 1984). The First Circuit has described six factors including: (1) whether the search requires exposure of intimate body parts or removal of clothing; (2) physical contact between the searcher and the suspect; (3) use of force; (4) whether the suspect is subjected to pain or danger; (5) the overall manner in which the search is conducted; and (6) whether reasonable expectations of privacy are abrogated by the search). *Id.* (citing *United States v. Braks*, 842 F.2d 509, 512 (1st Cir.1988)). With some rare exceptions, a search of objects external to a person's body is routine. *See Rivas*, 157 F.3d at 367 (finding that drilling into the body of a vehicle was a non-routine search); *but see United States v. Flores-Montano*, 541 U.S. 149, 155, 124 S. Ct. 1582 (2004) (expressly declining to rule on

5

"drilling" cases, but holding that "the Government's authority to conduct suspicionless inspections at the border includes the authority to remove, disassemble, and reassemble a vehicle's fuel tank").

Government agents may conduct non-routine warrantless searches at the border, but only if they have a "[r]easonable suspicion of criminal activity . . . based upon 'specific facts which, taken together with rational inferences therefrom, reasonably warrant an intrusion.'" *Rivas*, 157 F.3d at 367 (quoting *Cardenas*, 9 F.3d at 1153). An agent must have "a particularized and objective basis for suspecting the particular person" of smuggling contraband to possess the requisite reasonable suspicion for a non-routine search. *United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S. Ct. 3304 (1985). A reasonable suspicion is "more than an 'inchoate and unparticularized suspicion or hunch,'" but rather a "'common-sense conclusio[n] about human behavior' upon which 'practical people,'—including government officials, are entitled to rely." *Id.* (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 346, 105 S. Ct. 733 (1985); *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868 (1968)).

Here, Verma argues that the search of his computer and CD-ROMs at the airport was non-routine, in part because the agents brought in a forensic expert with "accompanying electronic equipment" to conduct a thorough search of the computer. At the outset, the court notes that the testimony does not support this characterization of the search. The forensic agent examining the computer—ICE Agent David Harrison—testified that the search he performed at the airport was a surface review of the files on the computer, and not, as Verma argues, a thorough forensic search of the computer. Moreover, the court finds that reviewing the files of a computer does not rise to the level of "invasion of the privacy and dignity of the individual" to make the search non-routine. *See Kelly*, 302 F.3d at 294.

Even had the search of the computer been as exhaustive as Verma claims, the court is not convinced it would be considered non-routine. The search of an object carried by the traveler threatens the dignity interest of the traveler far less than searches of the body of the traveler himself. Additionally, there is precedent to suggest that the thoroughness of the search is not dispositive. The Supreme Court, as recently as 2004, held that the search of a vehicle's gas tank was routine when the customs agents called in a mechanic who "raised the car on a hydraulic lift, loosened the straps and unscrewed the bolts holding the gas tank to the undercarriage of the vehicle, and then disconnected some hoses and electrical connections. After the gas tank was removed, the inspector hammered off bondo (a putty-like hardening substance that is used to seal openings) from the top of the gas tank." *Flores-Montano*, 541 U.S. at 151. The forensic examination of a computer would be achieved far more easily with less lasting damage than suffered by the car in *Flores-Montano*. *Accord United States v. McAuley*, 563 F. Supp. 2d 672, 677 (W.D. Tex. 2008) (drawing parallels to the search of a car's gas tank when finding the search of a computer's hard drive to be routine). The search did not invade Verma's body or damage his computer. Therefore, the search at issue in the instant case is routine.

However, even if it were non-routine, the search would still be constitutional. A warrantless non-routine border search requires a reasonable suspicion of wrongdoing to be constitutional. *Rivas*, 157 F.3d at 367. Here, the agents had the requisite particularized and objective basis for suspecting Verma of transporting child pornography. First, they had already traced downloaded files containing child pornography to Verma's IP address at his home. And, second, they knew that persons who deal in child pornography tend to carry at least some of it with them when they travel. The logical inference—that agents are allowed to draw in these cases—was that Verma would have some child

7

pornography on his person when he passed through the border check. The customs agents did not have to draw these inferences on the spot. The FBI had already placed an alert on Verma's passport, believing that he would pass through a border carrying child pornography. The Supreme Court has upheld far more intrusive searches on far less particularized information. *See Montoya de Hernandez*, 473 U.S. at 535–36 (upholding a body cavity search and x-rays on a plane passenger from Bogota based on inconsistent stories to customs and a distended abdomen). Accordingly, the search in this case—even if the court were to find it non-routine—would be constitutional.

**B.     Statements to the Agents**

At the border stop, federal agents interviewed Verma. Verma argues that he invoked his right to remain silent. However, agents continued to talk with him, never leaving him alone. Eventually, Verma made statements to the agents. Those statements, Verma argues, should be suppressed. The government counters that Verma signed a waiver of his *Miranda* rights and only selectively invoked "the Fifth" on specific questions that he refused to answer. Additionally, Verma never indicated that he wished to terminate the interview. And, although at the end of the interview he asked for an attorney, he never invoked his right to counsel during the interview. Therefore, the government argues that Verma waived his rights with regard to the statements he made to agents.

There seems to be no disagreement that Verma was in custody for the purposes of this inquiry. Therefore, the question is whether his subsequent statements that he would "take the Fifth" rescinded his original written waiver. "In order for a criminal suspect to validly waive his Miranda rights, two elements are necessary: (1) the relinquishment of the right must be 'voluntary in the sense that it was the product of a free and deliberate choice'; and (2) the waiver must be made with 'full awareness of the right being abandoned' and the consequences of doing so." *Soffar v. Cockrell*, 300

8

F.3d 588, 592 (5th Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986)). "The Government has the burden of proving, by a preponderance of the evidence, that a defendant voluntarily waived his rights and that his statements were made voluntarily." *United States v. Mullin*, 178 F.3d 334, 341 (5th Cir. 1999). "A confession is voluntary if it is the product of the defendant's free and rational choice; it is voluntary in the absence of official overreaching, either by direct coercion or subtle psychological persuasion." *Id.* "Whether a confession is voluntary is determined by considering the 'totality of the circumstances.'" *Id.*

Additionally, although the Fifth Circuit has not directly held that a suspect may selectively waive his *Miranda* rights and answer only some questions, it has upheld district courts that have admitted statements where a suspect selectively waived his *Miranda* rights. *See United States v. Jardina*, 747 F. 2d 945, 949 (5th Cir. 1984); *accord United States v. Eaton*, 890 F.2d 511, 513–14 (1st Cir. 1989); *Bruni v. Lewis*, 847 F.2d 561, 563–64 (9th Cir. 1988). Therefore, the determination of whether Verma wived his *Miranda* rights selectively, entirely, or not at all is a fact-based inquiry based on the totality of the circumstances.

Here, the initial waiver of rights is valid, because Verma signed a release. His subsequent refusals to answer questions, according to the testimony of the agents, was quite specific to those questions. He continued to answer questions on other topics. And, the agents agree that at no time did Verma indicate that he wished the interview to end. Based on the record of the case as a whole, it is evident that Verma is a highly educated man who undoubtedly understood the waiver he signed. His refusal to answer certain questions clearly indicates that he knew he could have continued to refuse to answer any questions if stopping the interview had been his goal. The court finds from a totality o the circumstances that Verma understood and intended that he was selectively exercising

9

his right to refuse to answer questions. Therefore, for those statements that he chose to make, Verma waived his *Miranda* rights.

**C.     Permission to Search Verma's Vehicle**

Verma presents two arguments for why the consent to search his car given by Roxanne Witte was insufficient. First, he argues that Witte lacked authority—apparent, actual, or common—to consent to the search. He maintains that she did not have a sufficient relationship to Verma's vehicle to consent to the search. Second, he argues that because agents knew he would not consent to the search, Witte could not consent to the search. Verma points to the case of *Georgia v. Randolph* where he argues the Supreme Court held that a wife's consent to search the home was invalid as to the husband, because his express refusal of consent to search was dispositive so as to override the wife's consent. 547 U.S. 103, 126 S. Ct. 1515 (2006).

The government counters that Witte had common authority as established by Fourth Amendment case law. Verma left the car in her possession while he was out of town. She had the keys to the car and drove it while he was gone. Under the concept of common authority, she therefore had actual authority to consent to the search of the vehicle. The government argues that the agents had the reasonable belief that Witte had authority to give them permission to search the vehicle, which is sufficient to make the search constitutional even if she did not have authority.

**1.     Authority**

Consent to search may be given by a third party with common authority over the premises to be searched. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990); *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988 (1974); *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991). Common authority exists when two people have "mutual use of the property" and "joint access or

control for most purposes." *Matlock*, 415 U.S. at 170 n. 7. In common authority situations, because the defendant "has already substantially ceded his expectation of privacy" to the third-party, then the defendant has "assum[ed] the risk" that the third-party might expose his or her privacy interest to others. *United States v. Shelton*, 337 F.3d 529, 535–36 (5th Cir. 2003). Moreover, "even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that he has obtained valid consent to search the area." *United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997). It is the reasonableness of the officers' conduct and "not what the consenting party knows" that is the focus of the Fourth Amendment inquiry under the apparent authority doctrine. *United States v. Tames*, 353 F.3d 606, 615 (8th Cir. 2003).

The court finds that it need not determine whether Witte had authority to consent to the search because the agents had an objectively reasonable belief that her consent was valid. Based solely on the evidence adduced by Verma, the court finds that the agents could reasonably have developed that belief. There is no argument that the car was parked in front of Witte's house during Verma's trip and that she had possession of the keys. And, at the very least she drove the car once. Nothing in the record demonstrates that she felt she had to ask permission from Verma before she used the car. Witte did not testify that she told the agents she was not allowed to drive the car, or that she had only driven it once. Instead, she testified that she had no recollection of discussing the amount she drove the car. She did call them to come and get the computer out of the car. Once there, she clearly had the keys to the car, which she readily gave to the agents. She admits that they knew she had the keys and kept the car while Verma was gone. Taking all of these facts together,

the agents could reasonably have formed the impression that she had mutual use of the property enough to establish common authority.

However, the record illustrates that the agents had more than just these facts before them when Witte gave the consent to search. According to Agent Stone's contemporaneous interview notes, Witte told the agents that she drove the car regularly and even explained the reason. She also told the agents that she had a key to his apartment which she used regularly. Therefore, the court finds that the agents had a reasonable belief that Witte had the authority to consent to the search of the vehicle.

### 2. Verma's Intent that the Vehicle Not Be Searched

Alternatively, Verma argues that because he was clearly trying to hide his computers from the agents by virtue of the fact that he had Witte remove them from his home, the agents knew that he affirmatively did *not* consent to a search of the vehicle. And, his non-consent overrides any consent Witte could have given under *Georgia v. Randolph*.

In *Georgia v. Randolph*, the Supreme Court addressed the issue of whether a physically present defendant's express denial of entrance to a property to search could be overridden by the consent of the defendant's wife—also physically present. 547 U.S. 103, 106, 126 S. Ct. 1515 (2006). Without abrogating *Matlock*'s definition and understanding of common authority, the Court held that in specific situations where a physically present co-tenant contemporaneously disputes consent to search, the government may not constitutionally enter based on the consent of another physically present co-tenant. *Id.* at 106, 116–17. In theory, therefore, if Verma already unequivocally denied them permission to search the vehicle, *Randolph* might stand for the proposition that Witte would no longer have the authority to consent.

However, unlike in *Randolph*, Verma did not expressly withold consent to search the car. He was not present at Witte's house when the agents first realized they needed to search the car. He argues that because he had gone to great lengths to hide the computers, the agents should have known that he did not consent to the search. But, in *Randolph* the Supreme Court left intact the common authority doctrine established in *Matlock*. And, to read *Randolph* to invalidate consent of the person with mutual use whenever the defendant or suspect would not want the evidence of his crime to be found would essentially eviscerate the premise of common authority. Additionally, and more to the point, the *Randolph* rule is an extension of the inquiry regarding the reasonableness of the government's belief in Witte's authority. And, it is the reasonableness of the government's belief that is dispositive. *Tames*, 353 F.3d at 515. If Verma had expressed an unequivocal denial of his consent to search the car, then the agents' belief in Witte's authority would be unreasonable. Here though, the agents did not learn of the car until they arrived at Witte's home. When they interviewed Verma at the airport the previous day, the agents asked about searching the Sugar Land address. Instead of specifically telling the agents that they did not have his permission to search his current residence or car or storage units, Verma gave them his wife's address and told them they would find nothing there. At best, the agents knew that Verma, as with every other person under investigation, did not want the incriminating evidence found. But, a generalized knowledge that Verma would not want the place where he was hiding his incriminating evidence searched is not sufficient absent an express unequivocal denial of consent to search. Therefore, the court finds that *Randolph* does not apply to the facts in the instant case. Accordingly, the consent to search Verma's car was valid and the evidence seized will not be suppressed.

**D.     Fruit of the Poisonous Tree**

Verma's last argument is predicated on a finding by the court that the search of the vehicle was unconstitutional. Since the court has determined that the consent to search the vehicle was valid, it need not address Verma's last argument.

## CONCLUSION

Pending before the court is defendant's motion to suppress evidence. Dkt. 41. Upon consideration of the motion, the response, the supplemental briefing, the evidentiary record, the applicable law, and for the foregoing reasons, the motion is DENIED.

It is so ORDERED.

Signed at Houston, Texas on April 8, 2010.

_____
Gray H. Miller
United States District Judge